IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ELIZABETH A. SCHULTZ,

                            Plaintiff,                              OPINION AND ORDER

        v.
                                                                   17-cv-622-wmc
COUNTY OF CHIPPEWA,
BRIAN KELLEY, and
PHILLIP MONTWILL,

                            Defendants.

Plaintiff Elizabeth (Beth) Schultz sued her former employer, the County of Chippewa, as well as the County's Highway Commissioner Brian Kelley and its Paving & Crushing Supervisor Phillip Montwill, claiming she was subjected to a hostile work environment, retaliation and finally constructive discharge, all because of her sex.[1] In response to defendants' motion for summary judgment, Schultz offers evidence that a male colleague was selected for a promotion over her because she had complained about another colleague's treatment of her, which forced her to resign. For the reasons discussed below, defendant's motion will be granted only as to plaintiff's hostile work environment and constructive discharge claims.

---

[1] More specifically, plaintiff asserts Title VII claims against her former employer, the County, and her § 1983 claims against her former colleagues, Kelly and Montwill, although the Seventh Circuit applies the same standards for proving intentional discrimination and hostile work environment under Title VII and § 1983 equal protection claims. *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003); *McPhaul v. Bd. of Com'rs of Madison Cty.*, 226 F.3d 558, 566 n.6 (7th Cir. 2000), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013). However, there is no retaliation claim under the Equal Protection Clause. *See Congleton v. Oneida Cty.*, No. 16-cv-412-wmc, 2017 WL 4621117, at *17-*18 (W.D. Wis. Oct. 13, 2017) (citing *Tate v. Ancell*, 551 F. App'x. 877, 898 (7th Cir. 2014); *Boyd v. Ill. State Police*, 384 F.3d 888, 898 (7th Cir. 2004); *Grossbaum v. Indianapolis-Marion Cty. Bldg. Auth.*, 100 F.3d 1287, 1296 n.8 (7th Cir. 1996); *Gray v. Lacke*, 885 F.2d 399, 414 (7th Cir. 1989)).

## A. Background

In 2011, Chippewa County hired Beth Schultz as a seasonal employee to drive a truck hauling gravel and hot mix asphalt.[3]  The following April, she was hired as an Operator II - Truck Driver and became a full-time employee.  Throughout her employment, Schultz was a truck driver or engaged in related activities; in addition to hauling gravel and hot mix, she picked up trash, repaired road signs, plowed snow, and communicated with other drivers to coordinate.  (Schultz Dep. (dkt. #24) 12:13-18; Schultz Decl. (dkt. #36) ¶ 4.)  Schultz's essential job responsibilities included: (1) "[o]perat[ing] haul trucks and other assigned light and heavy construction equipment, machinery and tools for highway

---

[2] Viewing the facts in the light most favorable to plaintiff as the non-moving party, the following facts are material and undisputed for purposes of summary judgment unless specifically noted below.  At the outset, however, the court notes that defendants impose a number of objections to plaintiff's additional proposed findings of fact as "self-serving" and lacking corroboration.  At least at summary judgment, neither is an appropriate objection: "[i]f based on personal knowledge or firsthand experience, [uncorroborated self-serving] testimony can be evidence of disputed material facts."  *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) (internal citations omitted).  Accordingly, the court must accept those proposed facts as true for purposes of summary judgment absent another, legitimate objection.  Likewise, defendants frequently object that proposed facts are "speculation[] and inadmissible hearsay," ignoring: (1) the admissibility of lay witness opinions "based [rationally] on the witness's perception," Fed. R. Evid. 701(a); and (2) the exclusion from hearsay for statements "made by the party's agent or employee on a matter within the scope of that relationship and while it existed," Fed. R. Evid. 801(d)(2)(D).  Again, those objections are not well taken.  Finally, the court notes that there was *significant* overlap between the parties' proposed findings of fact -- as well as significant repetition *within* defendants' proposed facts.  (*See e.g.*, Def.'s PFOF (dkt. #20) ¶¶ 38-44, 210-17.)  All of this creates unnecessary work for the parties and the court, and is contrary to the court's instructions.  (*See, e.g.*, Prelim. Pretrial Conference Order (available at dkt. #8) 4 ("The purpose of additional proposed findings of fact is to SUPPLEMENT the moving party's proposed findings of fact . . . ." (capitalization original)).)  Any reoccurrence by either side may result in appropriate sanctions.

[3] The court understands references to "hot mix" to refer to "hot mix asphalt," a combination of gravel, sand, or stone bound by asphalt cement.  *See What Is Hot Mix Asphalt Pavement?*, Asphalt Pavement Ass'n of Mich. (2018), http://www.apa-mi.org/what_is_hot_mix_asphalt_paveme.php.

and bridge construction and maintenance, construction and maintenance materials handling and sand and gravel mining"; and (2) "[c]ommunicat[ing] with truck drivers and other operators to coordinate materials handling and delivery." (Position Description (dkt. #37-1) 1.)[4]  She did not have any supervisory responsibilities.

Defendant Brian Kelley served as the "interim" and then Chippewa County permanent Highway Commissioner after the retirement of Bruce Stelzner in February 2016.[5]  Before that, Kelley had been the County's Deputy Highway Commissioner since July, 2014.  As Deputy Commissioner, Kelly was the direct supervisor of the other individual defendant, Phillip Montwill.

Until February or March 2015, Chippewa County's Paving & Crushing Supervisor was Richard Brand.  He reported to Deputy Commissioner Kelley as a mid-level manager, supervising 20-22 employees most of the year, including plaintiff Beth Schultz, as well as

---

[4] Defendants dispute this, explaining:

> The written job description from June of 2015 was the job description created before July of 2015 for the recruitment of applicants for the Operator IV Lab/Timekeeper position.  An applicant would have only seen the NEOGOV advertisement when she/he opened the NEOGOV link to the Operator IV Lab/Timekeeper position.  The NEOGOV advertisement was not the job description created in 2015, but it was sent to the Leader-Telegram or to other advertising agencies to help recruit for the position.

(Defs.' Resp. to Pl.'s Add'l PFOF (dkt. #40) ¶¶ 80-82 (internal citations to the record omitted).) However, the job description cited by plaintiff is for a "Truck Driver" position from a search conducted in March 2012. (*See* Position Description (dkt. #37-1) 1.)  Accordingly, this appears to be a summary of the Operator II position's responsibilities, not for the Operator IV-Lab/Timekeeper position.  Moreover, *defendants* seem to agree elsewhere in their submissions.  (*See* Defs.' PFOF (dkt. #20) ¶ 25.)  Regardless, the court must accept plaintiff's version of facts on summary judgment where credible evidence supports it.

[5] Stelzner had served as Highway Commissioner from 1990 until his retirement.

Kyle Craker and Matt Hartman. Brand gave the dump truck operators their assignments and provided instructions. Upon Brand's retirement in February 2015, defendant Montwill took over as the Paving & Crushing Supervisor.

Chippewa County sold aggregate and asphalt. Some project bids required the hot mix or aggregate's quality be certified to establish that it was the proper size -- the certification made it "state inspected gravel."[6] Until June of 2015, Matt Hartman served as an Operator IV-Lab/Timekeeper for the Highway Department, responsible for testing the hot mix and aggregate. Accordingly, Hartman (or his supervisor Brand) would certify the product's quality, including that the testing had been completed correctly.

Hartman was also responsible for keeping track of the locations and hours worked by the paving crew, plant operators, and truck drivers, which he documented in an Excel spreadsheet. The parties dispute the types of equipment he operated while in this position, including whether he used a backhoe. (Defs.' Resp. to Pl.'s Add'l PFOF (dkt. #40) ¶¶ 25-27.) Regardless, Hartman supervised and worked with Schultz in this role.

Beginning in 2013, plaintiff Schultz would fill in for Hartman when he was absent, and she also helped record time entries and test the asphalt or aggregate. (Hartman 10/2/18 Dep. (dkt. #27) 18:11-19:24.) More specifically, when Hartman was out, he would ask who wanted to assist with the timekeeping, and Schultz was the only volunteer. Deputy Commissioner Kelley and Supervisor Montwill knew that Schultz filled in when Hartman was absent. When serving as timekeeper, Schultz filled in timecards; prepared

---

[6] As aggregate is a material such as gravel, crushed stones, or sand, used in creating concrete or mortar. *See Aggregate Building Material*, Encyclopedia Britannica, https://www.britannica.com/technology/aggregate.

crew reports and Excel spreadsheets detailing equipment, time, and material charges, and she attached the receipts to crew reports.

## B. Schultz's Testing Experience

When not filling in for Hartman, Schultz worked in the lab with him. Hartman trained Schultz on timekeeping and testing. As a result, she began performing aggregate testing daily when Hartman was absent, but also conducted testing when Hartman was present. She initially assisted approximately once a week in 2013, but later performed parts of the testing herself. The parties dispute whether she ran *entire* tests by herself in 2014 and 2015. (Defs.' Resp. to Pl.'s Add'l PFOF (dkt. #40) ¶ 46.) As to hot mix testing, it is undisputed that Schultz began assisting Hartman in 2014. In 2014 and 2015, she assisted with testing a couple times a month. The parties also dispute whether she independently ran these tests. (*Id.* at ¶ 50.)

In March 2015, it is undisputed that Schultz attended training and became certified in aggregate testing. Other County employees, including Kyle Craker, also became certified. Schultz then became certified in hot mix testing.[7] Chippewa County paid for and arranged these trainings. Brand explained that Schultz was sent to these trainings so that if she replaced Hartman upon his retirement, she would be knowledgeable.

There is conflicting testimony about whether Hartman told Montwill that Schultz performed testing independently or that she was always supervised while working in the lab. (*Compare* Hartman 10/22/18 Dep. (dkt. #30) 4:2-5:17 *with* Montwill Dep. (dkt. #23)

---

[7] The parties agree that aggregate testing certification needed to be completed first because hot mix is comprised of aggregate. Certification is necessary to be able to sign off on any testing.

39:5-40:5.) There is no dispute, however, that Hartman testified that he informed Montwill that Schultz was "very capable" of handling asphalt and aggregate testing. (Hartman 10/22/18 Dep. (dkt. #30) 5:9-17.)

### C. Schultz's Interactions with Webber

Since 2005, Daniel Webber has worked as a truck driver for Chippewa County. During the summer months, Webber and Schultz would have daily contact, and during the winter, they had weekly contact because they were assigned to different sheds. In October or December 2014 when Schultz was filling in for Hartman, she made the rounds asking the truck drivers about their work location preferences. When she got to Webber, he rolled up his window and would not acknowledge her. He then disappeared with Bonnie Tylee, who also refused to take direction from Schultz. Schultz informed Kelley that she could not get all the sand hauled because she was down two trucks since Webber would not take direction from her.[8] Kelley noted that there were issues with Webber not wanting to run equipment and said that he would talk to Webber. (Schultz 4/19/17 Dep. (dkt. #24) 35:23-36:10, 36:24-37:4.) While Schultz did not know about any actions taken following her conversation with Kelley, Webber called Schultz the next day, and told her that "you're not my boss, I don't take orders from you" and "you don't belong in the lab, you belong in your truck. That's not your job." (Schultz 4/19/17 Dep. (dkt. #24) 37:10-38:5.) Around this time, Webber was heard commenting to Brand "that's what happens when you hire a woman" (Hartman 10/2/18 Dep. (dkt. #27) 44:25-45:3), although he

---

[8] She did not complain that this refusal was based on her gender, nor did she at that point complain about inappropriate comments.

denies making that statement (Webber Dep. (dkt. #26) 18:10-13).

For the last year and a half or so of Schultz's employment with Chippewa County, Webber generally stopped speaking to her. (*Id.* at 34:5-8.) Chippewa County truck drivers delivering materials to worksites communicate with later-arriving trucks about the jobsite, including driving instructions or directions, road conditions, project status, and safety information. Schultz contends that Webber refused to provide her with this information during this time. (Schultz Decl. (dkt. #36) ¶ 11.) Webber himself remembers communicating with Schultz only once via CB radio during that time period. (*Id.* at 49:12-20.) According to Schultz, that communication was an exception: from fall 2014 through August 20, 2015, Webber did not answer Schultz's attempts to communicate with him via CB radio. (Schultz Decl. (dkt. #36) ¶ 6.) Regardless, after October 2014, the only communication between Webber and Schultz was an occasional text. The parties agree that Webber did not harass Schultz via radio.

This lack of communication extended to Webber getting up and leaving when Schultz entered a room, even if Webber was in the middle of a conversation. Schultz contends that when around her, Webber would snicker. Further, Schultz maintains that many of her colleagues were more cautious and reserved in their dealings with her if Webber was around. (*Id.* at ¶ 36.) Despite the County custom of keeping trucks in a line, with them loading and going out in that order, Webber also had other employees load before Schultz even though it was her turn. (Schultz 4/19/17 Dep. (dkt. #24) 25:14-26:10.)

Finally, Schultz complains about a handful of statements made by Webber: (1) "we

only have four more months to work with her" when she walked in the button house, after which Webber left and another employee laughed (*Id.* at 31:15-32:4); (2) statements about her giving Brand a blowjob or sleeping with him (Schultz 10/2/18 Dep. (dkt. #25) 62:3-14; Schultz 4/19/17 Dep. (dkt. #24) 30:19-31:5);[9] (3) a sarcastic suggestion in spring 2015 to Brand that "we should hire more women" while frustrated that Schultz had not reloaded her truck (Webber Dep. (dkt. #26) 18:17-19:7, 21:5-22:9); and (4) following Schultz's return to work after a domestic violence incident, Webber loudly said "I can see why her boyfriend beats her" as she walked by (Schultz 4/19/17 Dep. (dkt. #24) 28:9-29:9).[10] Schultz also contends that at Webber's direction, Bonnie Tylee went to the Safety Committee with concerns about Schultz's workers' compensation claim while she was on leave. (Schultz 10/2/18 Dep. (dkt. #25) 78:23-79:14.)

In addition to her ongoing issues with Webber, Schultz now asserts generally that her colleagues often made off-color comments or told dirty jokes; one colleague stored Playboy magazines and hung a poster of a naked woman in the Cornell shed; and another kept dirty magazines and air fresheners shaped like naked women in his truck, which Schultz drove. (Schultz 4.19/17 Dep. (dkt. #24) 50:19-52:5, 52:16-25, 53:25-54:16, 54:23-56:5; 58:4-10.)

---

[9] The parties agree that Webber never directly said to Schultz that "she must be sleeping with her supervisors." (Pl.'s Resp. to Defs.' PFOF (dkt. #32) ¶ 157.)

[10] Webber denies making that statement, explaining that he said that he "underst[oo]d why it happened." (Webber Dep. (dkt. #26) 31:6-22.)

### D. Replacing Hartman

In June 2015, Hartman retired from his position as Operator IV-Lab Timekeeper. At that time, the Highway Department had a number of different Operator IV positions with different designations. When the applicant search officially began, the goal was to look internally and externally, although the external search occurred first.[11] Deputy Commissioner Kelley and Montwill were responsible for deciding who to hire.

#### 1. Job Description

The job description for the Operator IV-Lab Timekeeper position specified that "[e]quipment operating experience preferred." (Operator IV-Lab Timekeeper Position Description (dkt. #21-2) 2.) On the NEOGOV posting for this position, it listed ten minimum qualifications, including: (1) "[m]inimum three (3) years['] experience in roadway materials testing"; (2) "[e]quipment operating experience preferred"; (3) ability "to operate a variety of equipment relating to construction and maintenance of roads and bridges"; and (4) "[c]ertifications as determined by the County based on the position." (NEOGOV Posting (dkt. #37-4) 2.) The NEOGOV posting did, however, describe the position's job duties as "includ[ing] the ability to use a variety of heavy equipment for the construction and maintenance of roads and bridges." (*Id.* at 1.)

In May or June 2015, then Highway Commissioner Stelzner reviewed the position's written job description. The parties dispute whether the ability to operate a backhoe was

---

[11] The parties clarify that "external recruitment" meant considering "employees outside of pay grade and outside of Chippewa County." (Defs.' Resp. to Pl.'s Add'l PFOF (dkt. #40) ¶ 143.) Accordingly, the County required current employees in different operator categories to apply as external applicants.

a required qualification for this position.  (*Compare* Operator IV-Lab Timekeeper Position Description (dkt. #21-2) 3 *with* NEOGOV Posting (dkt. #37-4) 1-3 *and* Stelzner Decl. (dkt. #35) ¶ 7.)[12]  Likewise, the parties disagree about whether Hartman operated -- or was proficient in operating -- a backhoe while in the Operator IV-Lab Timekeeper position.[13] (Defs.' Resp. to Pl.'s Add'l PFOF (dkt. #40) ¶¶ 125-26.)  The parties agree that Schultz could not run a backhoe.

### 2. Schultz's Application and Interviews

Defendant Montwill called Schultz to tell her to apply for Hartman's job while she was on workers' comp leave.[14]  She immediately completed the online application, and hers ended up being the only application received for the Operator IV-Lab Timekeeper position.[15]  Schultz was also the only person initially interviewed for the position.

Kelley and Montwill conducted the interview on July 6, 2015.  During this interview, she told them that Webber did *not* take directions from her.  She did not complain about sexual comments or material in the workplace.  Following her interview, Kelley and Montwill concluded that Schultz had not met the minimum qualifications

---

[12] The parties seem to agree that:  (1) the NEOGOV Posting was the position for which Schultz applied; and (2) it accurately detailed the duties and responsibilities for the position.  (Pl.'s Resp. to Defs.' PFOF (dkt. #32) ¶¶ 82-83.)  That said, they agree that Schultz never saw the posting. (*Id.* at ¶ 84.)

[13] There seems to be agreement that Hartman would occasionally run some heavy equipment during the summer and would plow in the winter.

[14] In April 2015, Schultz injured her knee and was on leave until July 2015.

[15] Kyle Craker claims that he also applied, but he did not submit an application or resume.  The County also had no documents detailing Craker's education, experience or training.

because she did not have enough experience with lab testing. (Kelley Dep. (dkt. #22) 29:2-12; Montwill Dep. (dkt. #23) 45:3-13.) Schultz disputes the veracity of this assessment. Montwill also did not think she performed well during this interview. Still, Kelley explained that no decision was made on Schultz's application because they were going to have an internal search as well, which was the department's standard procedure.

The internal recruitment process resulted in four additional candidates, all of whom were interviewed over two days. These four candidates were all male, including Kyle Craker, who was interviewed on August 18, 2015. Two other applicants received rejection emails for failing to meet minimum qualifications. (*See* July 20, 2015 Email (dkt. #37-11) 1; July 20, 2015 Email (dkt. #37-12) 1.)

Schultz was also interviewed a second time on August 18, 2015. According to Kelley's notes at that interview, when asked about her weaknesses, Schultz identified being considered "a snitch" because she voices concerns, that she complains too much when upset, and that giving her the job would not be a popular decision. (Kelley Interview Notes (dkt. #37-7) 5.) Kelley's notes also detail: (1) she had "had enough of the bickering in truck shack"; (2) "currently not well-liked, probably will be the same if she gets this job"; (3) "last few years started getting caught up in negativity"; (4) "[h]as a problem w/ lazy people or people who complain all the time"; and (5) "always personality conflict w/ one co-worker, work it out & get over it." (*Id.* at 5-6; *see also* Kelley Dep. (dkt. #22) 62:6-64:8.) In contrast, Schultz maintains that during her interviews, she did *not* indicate that: (1) managing others was a weakness; (2) she had personality conflicts with co-workers in prior employment; (3) she anticipated difficulty giving directions to truck drivers; (4) she

was not well liked; or (5) she would likely continue being unliked if selected. (Schultz Decl. (dkt. #36) ¶¶ 28-31.) Schultz does acknowledge saying that there would be problems with Webber if she got the position. (*Id.* at ¶ 32.) In particular, Schultz also explains that she did not want to bring up her concerns about sexual comments and material in the workplace at this second interview because she did not want to sabotage her interview.

### 3. Schultz Complains about Webber

On August 18, 2015, the same day that Schultz had a second interview for Hartman's position, the County conducted a seminar on workplace bullying. During the seminar, Schultz saw that Webber was glaring at her. After the seminar, Schultz asked to meet with Kelley and told him that she "couldn't do this anymore," explaining that she could not do her job, cried at home every night, could not sleep, and had no desire to come to work. She told him about how Webber treated her and the comments he made. (Schultz 4/19/17 Dep. (dkt. #24) 87:6-23.) She also told Kelley that if she did not get the lab/timekeeper position she was going to put in her two weeks' notice. (Schultz 10/2/18 Dep. (dkt. #25) 84:23-85:12.) Schultz contends that at the end of their meeting, Kelley said "I don't know how to handle this." (Schultz 4/19/17 Dep. (dkt. #24) 85:12-86:14.) Kelley disputes saying that. (Kelley Dep. (dkt. #22) 57:6-10.)

Following this meeting -- at human resources director Toni Hohlfelder's suggestion -- Kelley prepared a memorandum to document his conversation with Schultz:

> Beth began by stating that she was curious about the lab/timekeeper position. . . . She mentioned that there are some issues amongst the hotmix drivers and that she really wants to know soon so she can move on if she doesn't get that job. She stated things are going so badly that she will be

> submitting her 2-week notice right away if she does not get the vacant lab /timekeeper promotion.
>
> * * *
>
> She started to get very upset and began crying as she thought about it. She did not want to give me a name of the employee, but said that one of the male truck drivers was doing everything in his power to make her life miserable and turn the other truck drivers against her. . . . The others appear to be talking about her all the time, it gets quiet whenever she comes in the room, and she overheard this man saying something to the effect of "it's no wonder her boyfriend beats her". At one point she said the name "Dan" when referring to this man, which I took to be Dan Webber.
>
> She referenced the time last year when Matt Hartman and Richard Brand were both out and Richard left her to distribute the workload for the day. Dan had ignored Beth's orders that morning and instead called Richard for different instructions . . . .

(Aug. 18, 2015 Memo. (dkt. #37-6) 1.)

Kelley met with Hohlfelder and Stelzner about the allegations made by Schultz. Kelley was advised to investigate the complaints, which he understood meant that he should sit down with Schultz to get the entire story and then talk with other employees who might have relevant information. Stelzner directed Kelley to contact Schultz to encourage her to speak with HR and give a statement. Kelley told Hohlfelder that Schultz said that she did not want to participate and no investigation occurred. In contrast, Schultz contends that: (1) no one -- including Kelley -- ever contacted her; (2) she never told Kelley that she did not want to participate in an investigation; and (3) she heard nothing about an investigation into her complaints. (Schultz 4/19/17 Dep. (dkt. #24) 88:6-11; Schultz Decl. (dkt. #36) ¶¶ 17-18, 21.)

### 4. Hiring of Kyle Craker

Ultimately Schultz was not hired for the Operator IV-Lab/Timekeeper position. Montwill explained that Schultz was not selected for the Operator IV-Lab Timekeeper position because she lacked experience and had not done any lab work with him.  On the other hand, Kelley's contemporaneous notes state that Schultz had not been selected because of "the turmoil that she felt would follow her into the position" and because "the top candidate would be better @ dealing w/ difficult staff."  (Kelley Interview Notes (dkt. #37-7) 6.)[16]  Finally, when Schultz called Kelley and asked why she had not been selected, she maintains that he told her that she "did not get the job because there's too much turmoil between you and Dan [Webber]."  (Schultz 4/19/17 Dep. (dkt. #24) 82:4-8.)

Instead, Kelley and Montwill decided to hire Kyle Craker for the Operator IV-Lab/Timekeeper position.  At the time of his hiring, he was an Operator IV-Crusher Operator.  Because of their job title, Craker and three other Operator IVs were not required to apply formally to be considered for Hartman's position.  Kelley contemporaneously noted that "Craker was chosen due to his skill set and because we felt he would be the best as a lead worker / assisting Phil w/ management."  (Kelley Interview Notes (dkt. #37-7) 2.) Kelley explained that "skill set" referred to Craker's "large amount of experience on the crushing operation," which would be "beneficial to a foundation of understanding testing," so that he could "go out to the crushing operation [following a failed test] and make

---

[16] Kelley explained that human resources directed that decisionmakers should note the primary reason why rejected candidates were not selected.

adjustments to the equipment." (Kelley Dep. (dkt. #22) 69:2-70:2.) Kelley also believed that Craker "would be most capable of handling" things when Phil was not around because of "his knowledge of crushing." (*Id.* at 70:23-71:11.) Montwill agreed. (Montwill Dep. (dkt. #23) 53:10-19, 54:25-56:1.) However, Schultz contends that this is not the real reason Montwill and Kelley selected Craker.

Kelley's interview notes show that Craker's experience with testing hot mix materials or aggregates involved a "class on agg testing, some gradation testing this summer, [but he] needs to go back to [the] book to remember testing procedures; no asphalt, only conceptual." (Kelley Interview Notes (dkt. #37-7) 1.) Montwill's notes show "Aggtec I Certified -- Several[] test[s] this summer. No HMA testing." (Montwill Interview Notes (dkt. #37-9) 1.) The parties agree that Craker only became certified to perform hot mix testing in 2016. Because of this, American Engineer Testing performed the hot mix testing before Craker received his certification, unlike while Hartman was the Operator IV-Lab Timekeeper, and the County did not rely on an outside lab for testing.

Kelley's interview notes reflect that Craker also added that it "[m]ay be difficult to work w/ crew in winter after making a few enemies as lead worker." (Kelley Interview Notes (dkt. #37-7) 2.) Montwill's notes do not include that additional information. Kelley's notes indicated Craker's weaknesses included "rough around the edges / harsh -- Phil can help w/ that -- blunt -- lack of hotmix testing experience." (*Id.* at 1.) These concerns were also documented in Craker's 2014 performance evaluation -- which was completed by Montwill and someone else on October 2, 2015 -- which states "Kyle is very passionate about his job, but he needs to improve his people skills and his ability to

compromise when he disagrees with others." (Craker Performance Review (dkt. #37-10) 1.)

In his interview notes, Montwill noted that Craker had little experience with email and none with Excel, but that he was willing to take necessary classes. Similarly, Kelley noted that Craker "would be slow on computer," "no computer used @ home, no computer in button house." (Kelley Interview Notes (dkt. #37-7) 2.) In comparison, Kelley's notes show that Schultz "emails regularly" and has "Excel experience/Windows 7 -- very comfortable." (*Id.* at 6.) Likewise, Montwill noted that Schultz had "used formulas in spreadsheets" and that email was "not an issue." (Montwill Interview Notes (dkt. #37-9) 8.)

### E. End of Schultz's Employment

Montwill told Schultz that she did not get the job on August 20, 2015. He informed her that the position had been offered to Kyle Craker. During that conversation, Schultz resigned, giving two weeks' notice. She said that she could no longer work in the Highway Department because of Webber's actions. She continued working that day until Webber physically prevented her from getting a can of soda from the refrigerator: when she tried to walk between Webber and another employee, Webber stepped in front of Schultz with his arms crossed. At that point, she left the jobsite. The next day, Friday August 21, Kelley phoned Schultz, asking her to reconsider returning to work. Schultz did not return to work on Monday, August 24. Her employment ended on August 20, 2015.

The parties agree that Kelley's notes from his August 20 phone call with Schultz state: "Received call, Beth Schultz. She is very upset that we didn't promote her to

Operator IV - Lab/Timekeeper and wants to quit. I urged her to think it out carefully before making a rash decision, and we agreed to talk again tomorrow morning."[17] The parties agree that Kelley wrote a memorandum summarizing his telephonic conversations with Schultz on August 20-21, but Schultz contends that the summary is inaccurate.[18]

## OPINION

Summary judgment is appropriate where the moving party establishes "that there is no genuine dispute as to any material fact" and it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, evidence is viewed "in the light most favorable to the non-moving party," but the "'court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence.'" *Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014) (quoting *Abdullahi v. City of Madison*, 423 F.3d 763, 769, 773 (7th Cir. 2005)). Here, defendants move for summary judgment arguing that plaintiff cannot establish: (1) sex discrimination; (2) a hostile work environment; (3) constructive discharge; or (4) retaliation. For the reasons discussed below, defendants' motion will be granted in part and denied in part.

## I. Failure-to-Promote

A plaintiff must establish four elements to make a prima facie case on a failure-to-promote claim: (1) "[s]he belongs to a protected class"; (2) "[s]he applied for and was qualified for the position sought"; (3) "[s]he was rejected for that position"; and (4) the

---

[17] The court could not locate these notes on the docket.

[18] This memorandum also does not appear to be on the docket.

employer gave the promotion to someone who was not better qualified, but was outside plaintiff's protected class. *Grayson v. City of Chi.*, 317 F.3d 745, 748 (7th Cir. 2003). Once a plaintiff has made this showing, the burden shifts to the defendants to articulate a "legitimate, nondiscriminatory reason" for plaintiff not being promoted. *Id.* If defendants can make that showing, the burden shifts again to plaintiff, this time to show that the articulated reason is pretextual. *Id.* (citing *Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993)).[19]

There is no dispute that plaintiff, as a woman, belongs to a protected class, nor that she was rejected for the Operator IV-Lab/Timekeeper position. Instead, defendants argue that plaintiff falls short of making her prima facie showing because she was not qualified for the position. Specifically, defendants argue that she: (1) did not have three years' experience in roadway materials testing; and (2) could not operate a backhoe. (Defs.' Opening Br. (dkt. #19) 9.) Likewise, they argue that plaintiff "was not the most qualified applicant" because Craker "had more practical and useful experience" as an Operator IV-Crusher Operator, so that he would know how to make adjustments if test samples failed. (*Id.* at 10-12.)

Plaintiff responds with evidence that she *was* qualified for the position: (1) she never received the "No Thank You" emails sent to candidates who did not meet the required

---

[19] As the parties recognize, the Seventh Circuit in *Ortiz* explained that the essential question at summary judgment in an employment discrimination case is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action[,]" with "all evidence belong[ing] in a single pile and . . . evaluated as a whole." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765-66 (7th Cir. 2016) (*see* Defs.' Opening Br. (dkt. #19) 8; Pl.'s Opp'n (dkt. #31) 5-6). As the parties have mostly framed their arguments under *McDonnell Douglas*, the court will follow suit.

qualifications; (2) operating a backhoe was not required, as the position description stated that experience operating heavy equipment was "preferred"; (3) Hartman never operated a backhoe in the position; and (4) the stated requirement of three years' experience testing materials was not an actual requirement, as demonstrated by the County's selection of Craker. (Pl.'s Opp'n (dkt. #31) 7-8.) If anything, plaintiff contends that the record shows she was more qualified than Craker because: (1) she had been trained to perform this position by Hartman before he retired, including how to prepare Excel reports and perform hot mix and aggregate testing; (2) she had more testing experience and better computer skills than Craker; and (3) the reasons put forward to justify Craker's selection -- his crushing experience, ability to manage people, and interview scores -- are undermined by other evidence. (*Id.* at 9-12.)

Whether or not she ultimately prevails at trial, plaintiff has marshalled enough evidence for a reasonable jury to find her not only qualified, but more qualified than Craker. First, she filled in for Hartman when he was absent, and he took her under his wing, teaching her how to perform various aspects of his position. Second, she certainly had more experience with Excel, and the Timekeeper portion of the position *required* extensive Excel use. Third, plaintiff had more testing experience than Craker, as he only received his hot mix certification in 2016. And while plaintiff did not have at least three years' experience in materials testing, neither did Craker. Fourth, there is a material dispute whether operating a backhoe was a minimum qualification for the position. (*Compare* Operator IV-Lab Timekeeper Position Description (dkt. #21-2) 3 *with* NEOGOV Posting (dkt. #37-4) 1-3 *and* Stelzner Decl. (dkt. #35) ¶ 7.) Likewise, plaintiff contends

that she was never informed that she failed to meet the minimum qualifications for the position. (Schultz Decl. (dkt. #36) ¶¶ 24-26.) Fifth, if plaintiff did not meet the minimum qualifications, why would defendant Montwill encourage her to apply *and* why would defendants have interviewed her twice for that position?

For many of these same reasons, plaintiff has put forward enough evidence for a reasonable jury to conclude that the reasons offered for hiring Craker were pretextual. The question the trier of fact must answer is whether the employer's stated reason was "a dishonest explanation, a lie rather than an oddity or an error." *Bodenstab v. Cty. of Cook*, 569 F.3d 651, 657 (7th Cir. 2009) (quoting *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008)). "Pretext can be shown by 'identif[ying] . . . weaknesses, implausibilities, inconsistencies, or contradictions' in an employer's asserted reason for taking an adverse employment action such 'that a reasonable person could find [it] unworthy of credence.'" *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 487 (7th Cir. 2015) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 852-53 (7th Cir. 2012) (alterations in original)).

As already discussed above, there is a dispute about what the actual minimum qualifications were, and a reasonable jury could conclude that plaintiff was more qualified than Craker. Further, plaintiff had advanced evidence for a reasonable juror to find defendants' purported conclusion that Craker would be better at "managing people" was plainly contradicted by the evidence before them, based on information that she did *not* provide during her interviews, and a pretext for sexist assumptions about her. Specifically, she notes that Kelley recognized that Craker was "rough around the edges" and that his

performance evaluation a few months later stated that he "need[ed] to improve his people skills." (Pl.'s Opp'n (dkt. #31) 11.) More importantly, plaintiff plausibly contends that she did not state (and would not have stated) during interviews that she had personality conflicts with colleagues, or that managing people was a weakness, in direct contradiction to Kelly's supposedly contemporaneous notes. (Schultz Decl. (dkt. #36) ¶¶ 28-29; *see also id.* at ¶¶ 27, 30-31 (averring that she did not say promoting her would be unpopular, that she would have trouble getting truck drivers to follow her instructions, nor that she was not liked and would probably remain so if promoted).) She also contends that her interview scores were fabricated, and Montwill outright lied about what Hartman said about her performance. (Pl.'s Opp'n (dkt. #31) 15.) Finally, plaintiff contends Kelley told her that she did not get the position because of the "turmoil" between her and Webber, which is also noted on Kelley's interview notes, and that defendants' reasons have shifted over time to include her not meeting the position's minimum qualifications, something not even mentioned in defendants' ERD interrogatory response. Accordingly, there is enough for a reasonable jury to conclude that the stated reasons for not promoting her were pretext and that plaintiff was discriminated against based on her sex.

## II. Hostile Work Environment & Constructive Discharge

A plaintiff must establish four elements to avoid summary judgment on a hostile work environment claim: "(1) the work environment must have been both subjectively and objectively offensive; (2) her gender must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability." *Orton-Bell*, 759 F.3d at 773 (quoting *Chaib v. Indiana*, 744 F.3d 974, 985 (7th

Cir. 2014)).  Defendants contend that plaintiff cannot make her *prima facie* showing because "the harassment complained of . . . was not frequent, threatening, or humiliating, and . . . did not unreasonably interfere with [plaintiff's] work performance."  (Defs.' Opening Br. (dkt. #19) 14.)  Specifically, defendants contend that from fall 2014 until her resignation on August 20, 2015, there was "very little opportunity" for Webber and Schultz to interact because: (1) they were assigned to different sheds during the winter months so that they only interacted weekly; and (2) Schultz was on workers' compensation leave from April through July 2015.  (*Id.* at 14-15.)

Plaintiff responds that Webber's conduct was pervasive because it "extended to all aspects of [her] employment," impacted her ability to do her job, and was "a daily occurrence during the summer months."  (Pl.'s Opp'n (dkt. #31) 23.)  She adds that defendants misconstrue the basis for her hostile work environment claim by ignoring: (1) the sexualized work environment; (2) Webber's shunning of and refusing to communicate with Schultz; (3) Webber's encouragement of temp workers to load in front of Schultz out of order; (4) Webber's use of Tylee to challenge Schultz's workers' compensation claim; (5) Webber's intimidating behavior on August 20, 2015; and (6) Montwill and Kelley's failure to promote Schultz.  (*Id.* at 23-24.)

A court evaluating the pervasiveness and severity of conduct examines "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004) (quoting *Russell v. Bd. of Trs. of Univ. of Ill. at Chi.*, 243 F.3d

336, 343 (7th Cir. 2001)). Consistent with this standard, the court is not to consider separately whether each incident is severe or pervasive. *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 626 (7th Cir. 2018) (citing *Hall v. City of Chi.*, 713 F.3d 325, 331 (7th Cir. 2013)). That said, courts may consider factually distinct complaints separately. *See Orton-Bell*, 759 F.3d at 773-76 (explaining why the "sex-on-the-desk incident" failed to establish a hostile work environment before explaining why "[t]he constant barrage of sexually charged comments" succeeded).

Here, plaintiff has failed to show that she was subjected to a hostile work environment. Webber's complained-of comments, refusals to interact with plaintiff, shunning her, and physical intimidation cannot form the basis for a hostile work environment claim because his conduct was neither severe nor pervasive. As plaintiff concedes: (1) "Webber's harassment began in the fall of 2014" (Pl.'s Opp'n (dkt. #31) 23); (2) Webber and Schultz were assigned to different sheds during the winter months (approximately November to April), so that their interactions were no more than on a weekly basis (Pl.'s Resp. to Defs.' PFOF (dkt. #32) ¶¶ 152-54); (3) Webber did not harass her via radio (*Id.* ¶ 156); and (4) Schultz was out on workers' compensation leave from April until July 2015 (*id.* at ¶ 183). Accordingly, there was not enough opportunity for Webber to harass plaintiff.

As to the other claimed bases for plaintiff's claim, they also are insufficient. First, while the work environment included sexual jokes, comments, magazines and fresheners, there is nothing to suggest that their presence was motivated by plaintiff's sex. Further, plaintiff acknowledges that she "let these things roll off her shoulders" (Pl.'s Opp'n (dkt.

#31) 23), indicating that the workplace was not subjectively offensive. While having these items and making these comments at work were certainly in poor taste, there is, therefore, no evidence that they impacted her job performance. Second, Tylee's complaint to the Safety Committee, ostensibly at Webber's insistence, while improperly motivated, is neither severe nor pervasive and lacks any basis for employer liability. Third and finally, the decision of Montwill and Kelley not to promote plaintiff simply does not sound in hostile work environment.[20]

Further, because plaintiff has failed to establish a hostile work environment claim, she cannot establish a claim for constructive discharge. To establish a constructive discharge claim, a plaintiff "must prove that [her] working conditions were so intolerable as a result of unlawful discrimination that a reasonable person would be forced into voluntary resignation." *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000) (citing *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 517 (7th Cir. 1996)). Plaintiff cannot make that showing here because "[w]orking conditions for constructive discharge must be even more egregious than the high standard for hostile work environment; 'in the "'ordinary'" case, an employee is expected to remain employed while

---

[20] Additionally, Chippewa County's harassment policy directs complaints about possible sexual harassment to be "reported (in writing) to [an employee's] supervisor who will in turn notify the Affirmative Action Officer in the Personnel Department" for investigation. (Harassment Policy (dkt. #37-13) 1.) There is no dispute that plaintiff did not submit a written complaint under this policy and it appears she only notified defendants of Webber's actions during the interview process, except for the 2014 incident when Webber refused to take direction from her. That complaint, however, was not tied to plaintiff's sex or gender. Likewise, it appears plaintiff never complained about the other aspects of her alleged hostile work environment raising a question about whether there was a basis for employer liability. *Cf. Orton-Bell*, 759 F.3d at 776 (finding enough evidence for a jury to find a basis for employer liability where plaintiff "made repeated complaints" but "no corrections were made").

seeking redress.'" *Id.* (quoting *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 886 (7th Cir. 1998)). Accordingly, defendants' motion for summary judgment will be granted both as to plaintiff's hostile work environment and constructive discharge claims.

## III. Retaliation

A plaintiff can prevail on a retaliation claim only if she proves that she: "(1) opposed an unlawful employment practice under Title VII; (2) was the object of an adverse employment action; and (3) the adverse employment action was caused by her opposition to the unlawful employment practice." *Congleton v. Oneida Cty.*, No. 16-cv-412-wmc, 2017 WL 4621117, at *16 (W.D. Wis. Oct. 13, 2017) (citing *Cullom v. Brown*, 209 F.3d 1035, 1040 (7th Cir. 2000)). This requires the plaintiff to have complained about discrimination based on a protected class; failing to indicate a connection to a protected status -- either explicitly or through facts establishing that inference -- is insufficient. *Orton-Bell*, 759 F.3d at 776 (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)) (affirming summary judgment on retaliation claim where plaintiff failed to link complaint to protected status as a woman, such that complaint could not be basis for retaliation claim); *see also Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997,1007-08 (7th Cir. 2000) (explaining that "[a]n employee, of course, need not use the words 'pregnancy discrimination' to bring her speech within Title VII's retaliation protections. But she has to at least say something to indicate her pregnancy is an issue. An employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints."). Accordingly, the question here boils down to "whether an employer has acted in such a

way that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Porter v. City of Chic.*, 700 F.3d 944, 957 (7th Cir. 2012) (quoting *Thompson v. N. Am. Stainless, LP*, 131 S. Ct. 863, 868 (2011)). If plaintiff makes this showing, the burden shifts to defendants and then back to plaintiff, as it did with her failure to promote claim. *See Miller*, 203 F.3d at 1007.

Defendants do not appear to challenge plaintiff's *prima facie* case, the court notes that there is no dispute that: (1) plaintiff complained to Kelley on August 18, 2015 about the behavior of Dan Webber; and (2) plaintiff was not selected for the Operator IV-Lab/Timekeeper position. Plaintiff argues that "Defendants understood that Plaintiff engaged in a protected activity as Kelley reported Schultz's complaints of sexual harassment to the Human Resources Manager and was instructed to talk to Schultz about a harassment investigation." (Pl.'s Opp'n (dkt. #31) 19.) Finally, as to evidence of causation plaintiff points to: (1) "suspicious timing" (the two days between her complaints and being told that she was not selected for the promotion); and (2) Kelley telling her that she had not been selected due to the "turmoil" between Webber and her, which was the subject of her complaints. (*Id.* at 20.)

Here, defendants instead fall back on their arguments regarding plaintiff's failure-to-promote claim: defendants provided nondiscriminatory, legitimate reasons for selecting Craker for the Operator IV-Lab/Timekeeper position -- she was not qualified and Craker's experience -- that plaintiff cannot show were pretext. (Defs.' Opening Br. (dkt. #19) 20-22.) However, as addressed above, there is enough evidence from which a reasonable jury could conclude that the reasons offered for hiring Craker and rejecting plaintiff were

pretextual. Accordingly, defendants' motion for summary judgment on plaintiff's retaliation claim is denied.

## ORDER

IT IS ORDERED that Defendants' motion for summary judgment (dkt. #18) is GRANTED as to plaintiff's hostile work environment and constructive discharge claims and DENIED in all other respects.

Entered this 15th day of February, 2019.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge